JOHN G. PASCHAL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Paschal v. Commissioner
Docket No. 5202-91
United States Tax Court
T.C. Memo 1994-380; 1994 Tax Ct. Memo LEXIS 389; 68 T.C.M. (CCH) 366; 94-2 U.S. Tax Cas. (CCH) P47,942; August 15, 1994, Filed *389 Decision will be entered under Rule 155. John G. Paschal, pro se. For respondent: Daniel K. O'Brien. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows: Additions To Tax
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(b) 6653(b)(2)
6661
1980
$ 34,186
$ 17,093
-
-
1981
69,510
34,755
-
-
1982
5,832
2,916
[2]
$ 1,458
The issues for decision are: 1. Whether increases in petitioner's net worth were due, as petitioner contends, to the following nontaxable sources of income: (1) Seventy-five thousand dollars in loans from his sister, (2) $ 50,000 buried in his back yard, (3) $ 35,000 from the sale of two Corvettes, and (d) $ 20,000 from the sale of a bulldozer. We hold that they were not. 2. Whether respondent's determination that petitioner had unreported income of $ 121,158 for 1980, $ 128,764 for 1981, and $ 17,857 for 1982, by use of the net worth plus expenditures method, was correct. We hold that respondent's determination was correct, except *390 as respondent concedes below. 3. Whether petitioner is collaterally estopped from denying that the addition to tax for fraud applies to the deficiency in income tax for the year 1981. We hold that he is. 4. Whether petitioner is liable for the addition to tax for fraud for 1980, 1981, and 1982 pursuant to section 6653(b) and 6653(b)(1) and (2). We hold that he is. 5. Whether petitioner has shown any impropriety in the handling of his case by respondent's agents. We hold that he has not. Respondent concedes that $ 17,500 of petitioner's net worth increase for 1981 was from nontaxable sources. Thus, respondent now contends that the deficiency in income tax is $ 60,178 and the addition to tax for fraud under section 6653(b) is $ 30,089. Respondent made no argument at trial or on brief with respect to the section 6661 addition to tax, which is therefore deemed abandoned. We find for petitioner on this issue. Section references are to the Internal Revenue Code of 1954 in effect during the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
*391 Petitioner resided in Mine Hill, New Jersey, when he filed his petition. Petitioner filed joint income tax returns for 1977 to 1982 with his then wife, Thelma Paschal. Petitioner executed Forms 872 extending the period to assess income tax for 1982 to December 31, 1989. From 1980 to 1982, petitioner had checking and savings accounts but kept no formal books and records for his Schedule C businesses. He commingled personal and business funds. 2. Petitioner's Financial History and Net Worth on December 31, 1979[1]
The parties stipulated the items in the net worth analysis except for petitioner's opening net worth. We find that petitioner's opening net worth as of December 31, 1979, was $ 15,000 (as determined by respondent), and that he did not have as nontaxable sources *392 of income a $ 75,000 loan from his sister, Mary Ann Brinkley, $ 50,000 from his father, $ 35,000 from the sale of two Corvettes, or $ 20,000 from the sale of a bulldozer. Petitioner's contentions to the contrary are discussed below. a. Pre-1979
From 1954 to 1978, petitioner's net income as shown on income tax and Social Security records was less than $ 10,000 each year, except for 1 year in which he reported $ 11,150. In May 1976, petitioner borrowed $ 60,000 from his father, George Paschal. Petitioner has not repaid this loan. In June 1979, petitioner borrowed $ 27,000 from the New Jersey National Bank to buy a 1979 Ford truck. From 1973 to 1979, petitioner spent $ 452,229. His reported income for that period was $ 309,258. From 1976 to 1979, petitioner's yearend bank account balances increased or decreased as follows: 1976
1977
1978
1979
$ 16,790.79
$ 25,060.09
$ 62,740.93
($ 10,425.66)
On November 27, 1979, petitioner invested $ 30,000 in certificates of deposit at the Morris County Savings Bank. On November 21, 1979, petitioner invested $ 25,000 in a commercial paper investment at the United Jersey Bank. On November 28, 1980, petitioner rolled *393 over the latter amount to another commercial paper investment at United Jersey Bank. From September to December 1979, petitioner rolled over $ 61,024 from matured certificates of deposit to other certificates of deposit at the Morris County Savings Bank and the Lakeland Savings and Loan Bank. In 1979, petitioner received an $ 81 insurance premium refund from Traber, Vreeland and Barnett, Inc. Petitioner had cash on hand of $ 15,000 or less on December 31, 1979. b. 1979 to 1982
From 1979 to 1982, petitioner received no gifts in excess of $ 1,000. From 1979 to 1982, petitioner did not maintain any bank accounts or hold any property as trustee or agent for anyone. From 1979 to 1982, petitioner's then wife, Thelma Paschal, provided none of the funds that petitioner acquired after January 1, 1979. The most likely source of petitioner's net worth increases from 1980 to 1982 was interest income and income from his auto parts business. c. Petitioner's Bank Accounts
Petitioner provided the funds for all bank accounts held in his name and his children's names from 1980 to 1982. Petitioner had money at three different banks in more than 20 checking, savings, and money market *394 accounts and certificates of deposit. Some were held in his name, and some were held in the names of members of his family. d. Petitioner's Real Estate
On May 22, 1967, petitioner and his then wife, Thelma Paschal, bought a house in Mine Hill, New Jersey, for $ 20,000. On February 9, 1973, petitioner bought a farm in Troupsburg, New York, for $ 10,000. In February 1976, petitioner bought 20 acres of land near his home in Mine Hill, New Jersey, for $ 65,000. On December 7, 1976, petitioner bought two tax liens totaling $ 924.63 from the municipality of Mine Hill. On August 1, 1980, petitioner bought five tax liens totaling $ 15,913.08 from the municipality of Randolph Township. On November 25, 1981, petitioner bought a house in Taylors, South Carolina, for $ 62,000 in cash. e. Petitioner's Automobiles
Petitioner bought the following automobiles and other vehicles: Year
Vehicle Price Comments
1972
wrecked 1971
$ 1,400
stolen in 1980 and  Pantera
never recovered  1972
1972 Ford backhoe
4,500-
owned through 1982  5,000
1974 or
1970 Ski Doo
400-
owned through 1982  1975
snowmobile
500
1977
Ford tractor
12,294
1978
1978 Mercedes
26,100
1979
wrecked 1979 Ford
1,000
sold in 1983  pickup truck
1979
Ford truck
33,500
$ 6,500 downpayment,  27,000 financed  1979
wrecked 1978
500
given to petitioner's  Chevrolet Camaro
son in 1981  1979-
1971 GMC pickup
1,000
1982
truck
1979-
1967 amphibious
1,200
1982
vehicle
1980
wrecked 1979
3,000
sold in 1981  Corvette
1981
1977 Chevrolet
7,000
owned through 1982  Corvette
1981
1981 Corvette
14,350
*395 In May 1981, petitioner sold a GMC Rollback truck to his brother-in-law John Pederson (Pederson) for $ 10,000. In 1981, Pederson made payments of about $ 6,750 on the truck. 3. Petitioner's Tax Returns
Albert J. Lusardi (Lusardi), a part-time income tax preparer, prepared petitioner's income tax returns for 1980, 1981, and 1982 based on summary figures petitioner gave him. Petitioner reported Schedule C income from Nick's Auto Parts on his 1980 and 1981 income tax returns. He skimmed money from Nick's Auto Parts and did not report all of the income he received from the business. He reported Schedule C income from John Paschal mortgages on his 1981 and 1982 returns, and he reported Schedule C income from the business of selling hay on his 1982 return. Petitioner did not deduct depreciation for bulldozers on his 1980 or 1981 income tax returns. In 1987, petitioner pleaded guilty to willful attempted evasion of his individual income tax for 1981 in violation of section 7201. 4. Petitioner's Auto Salvage Business
In 1980, petitioner operated a sole proprietorship, Nick's Auto Parts, an auto salvage business that specialized in Corvettes. Nick's Auto Parts was *396 primarily a cash business. Petitioner operated Nick's Auto Parts on a tract of land about 190 feet by 290 feet adjoining his residence. In 1976, he obtained 20 more acres nearby. In 1979 and 1980, the town of Mine Hill required petitioner to move auto parts which he had stored on the 20 acres to his salvage yard, and to enclose the salvage yard with a 10-foot fence. On July 15, 1980, agents from the New Jersey Department of Motor Vehicles (DMV) came to petitioner's place of business with a search warrant and removed three wrecked automobiles. In 1981, petitioner was arrested for, and in June or July, criminally charged with, misrepresenting title to the three cars that were removed by the DMV. The DMV charges were administratively dismissed late in 1981. These events created tremendous pressures on petitioner and his family. Petitioner's wife left him and moved to South Carolina. Later she decided to divorce petitioner. They signed a settlement agreement in January 1982. Petitioner decided in 1980 to get out of the auto salvage business. He began advertising and making bulk sales of the equipment and parts in 1980 and 1981. In September 1980, petitioner agreed to sell *397 the salvage business to Michael Homza (Homza). In early 1982 when petitioner had complied with all that the town required (i.e., renewing his junk license, putting up the fence, and getting rid of the inventory), Homza agreed to buy the property. Petitioner sold inventory to prepare for the 1982 closing. Homza agreed to take the auto parts left at that time. Before the closing, some neighbors sued the mayor, the town council and petitioner, seeking the removal of the 10-foot fence. Petitioner ultimately prevailed, but the litigation delayed the sale to Homza. In October 1982, Homza died. His widow later voided the contract. 5. Petitioner's Mortgage Lending Activity
In 1980, petitioner was also in the business of making mortgage loans to property owners. Petitioner's mortgage loans receivable were $ 57,390 in 1979, $ 295,630 in 1980, $ 413,973 in 1981, and $ 333,374 in 1982. All the mortgage money petitioner lent from 1979 to 1982 was from his funds. 6. Hay Fire on Petitioner's Property -- 1981
On November 18, 1981, a fire destroyed a lean-to on petitioner's property which contained bales of hay. Petitioner filed a claim with W.H. Anderson Insurance Agency, *398 Dover, New Jersey, on a home insurance policy which provided coverage up to $ 6,500 for out-buildings on the property. On December 2, 1981, petitioner received a $ 1,170 check for this claim. Petitioner also filed a claim relating to this fire with Farm Family Insurance Co., Hackettstown, New Jersey. This insurance policy provided coverage up to $ 7,500 for hay and $ 7,000 for the hay barrack. Petitioner received $ 14,500 for this claim. 7. Petitioner's Sister, Mary Ann Brinkley
Mary Ann Brinkley is petitioner's sister. She was married to William Brinkley from 1964 to 1971. In 1964, William Brinkley's net worth was more than $ 500,000. During their marriage, William Brinkley did not give money to Mary Ann Brinkley other than for regular living expenses. William Brinkley instituted divorce proceedings against Mary Ann Brinkley late in 1970. Mary Ann Brinkley received $ 500, a Ford Falcon, and some furniture from Sears in the divorce. William Brinkley died in July 1980. In 1982, petitioner made a $ 15,000 mortgage loan to the Norwood Inn and recorded it in Mary Ann Brinkley's name to conceal the transaction from his then wife, Thelma Paschal. Between 1983 and 1985 *399 petitioner transferred title to 20 acres of land and a house on Lake Hopatcong to his father. By early 1991, title to the house on Lake Hopatcong had passed to Mary Ann Brinkley, and title to the 20 acres of land had passed to a corporation of which she was the sole stockholder. Petitioner's claim that his sister lent him $ 75,000 is discussed below in the opinion. 8. Respondent's Investigation and Audit of Petitioner
a. Criminal Investigation
Special Agents Alan Tunkavige and Jack Holland came to petitioner's home in February 1984 and told him that he was the subject of a criminal investigation. They told petitioner he had a right to legal counsel, but petitioner did not request counsel. Petitioner complied with the special agents' requests during at least eight interviews and many telephone conversations. Respondent began to investigate petitioner's income tax liabilities as a result of information respondent's Criminal Investigations Division's Organized Crime Project for North New Jersey received from Detective Charles Canfield of the Mine Hill Police Department. Respondent's investigation was not based on information obtained from Lt. Bernard Kelly or from *400 any other representative of the New Jersey State Police. Special Agent Tunkavige has never met or spoken with Lt. Kelly. During Special Agent Tunkavige's investigation petitioner never claimed that he: (1) Had $ 50,000 buried in his backyard at the end of 1979; (2) received loans totaling $ 75,000 from his sister or her husband, William Brinkley; or (3) had $ 50,000 of U.S. Treasury securities on December 31, 1979. Petitioner told Special Agent Tunkavige that he did not own a bulldozer during the relevant time period. b. Examination Division
From April 1988 to early 1989, petitioner attended conferences in the Examination Division, Newark District Office, relating to his 1980 to 1982 tax years. At those conferences, petitioner said that he had $ 50,000 cash buried on his property on December 31, 1979. However, petitioner did not say that his sister had lent him $ 75,000 or that he had $ 50,000 in U.S. Treasury securities at the end of 1979. c. Appeals Office
From March to October 1990, petitioner attended conferences in respondent's Appeals Office relating to his 1980 to 1982 tax years. At those conferences, petitioner contended that he had $ 50,000 cash on hand *401 on December 31, 1979, in addition to the $ 15,000 that he had previously claimed he had at the end of 1979 in an affidavit he submitted to respondent's Criminal Investigations Division. Petitioner did not claim that his sister had lent him $ 75,000 or contend that he had $ 50,000 in U.S. Treasury securities at the end of 1979. Based on an analysis of assets acquired and expenditures made by petitioner from 1980 to 1982, respondent determined that petitioner failed to report taxable income of $ 121,158 for 1980, $ 128,764 for 1981, and $ 17,857 for 1982. OPINION 1. Respondent's Use of the Net Worth Method
Respondent used the net worth method to determine petitioner's income for the years in issue. Under the net worth method, income is computed by determining a taxpayer's net worth at the beginning and end of a year. The difference between the two amounts is the increase or decrease in net worth. This difference is increased by adding nondeductible expenditures, including living expenses, and decreased by subtracting gifts, inheritances, loans, and the like. ; , *402 affg. . An increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, may be considered to be taxable income. In a net worth case, the Commissioner must: (a) Establish, with reasonable certainty, an opening net worth, and (b) either (i) show a likely income source, or (ii) negate possible nontaxable income sources. ; (Court reviewed), affd. ; , affd. without published opinion . The Commissioner must also investigate all leads presented by the taxpayer which are reasonably susceptible of being checked. . Petitioner agrees to respondent's net worth analysis, except petitioner contends that respondent failed *403 to include certain items, discussed below, in his opening net worth. Petitioner also asserts that respondent failed to adequately investigate leads provided by petitioner relating to his cash accumulations as of December 31, 1979. 2. Opening Net Worth
Petitioner contends that respondent failed to include the following items in his opening net worth as of December 31, 1979: (1) A $ 75,000 loan from petitioner's sister, Mary Ann Brinkley; (2) U.S. Treasury securities totaling $ 50,000, purchased in part with funds provided by petitioner's father; (3) two Chevrolet Corvettes, which he contends he sold in 1980 for $ 35,000; and (4) a bulldozer, which he contends he sold in 1980 for $ 20,000. a. $ 75,000 Brinkley Loan
Petitioner contends, and Mary Ann Brinkley testified, that during her marriage to William Brinkley he gave her about $ 75,000 in gifts. She said William Brinkley suggested that she give the money to petitioner to buy property in New Jersey. As a result, she said she gave $ 40,000 to petitioner in 1968 or 1969, and an additional $ 35,000 in the early 1970s. Petitioner contends that these amounts were delivered to him in cashier's checks in small amounts. *404 Petitioner has not repaid any of the $ 75,000 which he purportedly received from his sister. We are not convinced that Mary Ann Brinkley lent petitioner $ 75,000. First, petitioner's explanation was not credible. For example, petitioner testified that he received the $ 75,000 from his sister, but in May 1991, at the trial of an equitable distribution suit brought by petitioner's former wife, Thelma (the State court trial), he said that the $ 75,000 came from William Brinkley. He also testified that he did not know if the $ 75,000 loan was a part of the divorce agreement between Mary Ann and William Brinkley; in contrast, at the State court trial, he testified that he did not owe $ 75,000 to the estate of William Brinkley because the debt was transferred to his sister in consideration of the divorce. Second, there is no contemporaneous documentary evidence that there was a loan. Third, petitioner contends that, to secure this loan, he prepared, at his sister's request, a new will naming her as the beneficiary, but neither he nor his sister had a copy of the purported will at trial. Fourth, we do not believe William Brinkley gave Mary Ann Brinkley $ 75,000 as claimed. Michael *405 Brinkley, who represented his father in the divorce proceedings against Mary Ann Brinkley, testified that his father gave no money to Mary Ann Brinkley except money for groceries and regular living expenses. Petitioner argues that Michael Brinkley's claim that he regularly reviewed his father's books is not credible, and that it is possible that he missed some of his father's expenses. Petitioner argues that Mary Ann Brinkley was a credible witness and Michael Brinkley was not. We disagree. Fifth, before their divorce, petitioner sought to place a $ 15,000 mortgage loan made to the Norwood Inn and title to 20 acres of land and a house at Lake Hopatcong beyond the reach of his estranged wife, Thelma Paschal, and used his sister and father as nominees to achieve that purpose. At the State court trial, petitioner said that he transferred this real estate because he owed his sister $ 75,000 and wanted to secure her interest. At that trial, petitioner introduced into evidence a letter to him from his sister dated April 30, 1991, 6 days before the start of the State court trial. Mary Ann Brinkley's testimony about the loan differs from that letter. In the letter, she said that her *406 former husband gave petitioner $ 75,000 to make investments in New Jersey real estate for her. In contrast, at trial she testified that she gave the $ 75,000 to him from the proceeds of money that her husband gave her during their marriage. Sixth, petitioner did not mention the purported $ 75,000 loan to any representative of respondent before 1990. Finally, even if we accepted petitioner's claim that Mary Ann Brinkley lent him $ 75,000, this would not affect petitioner's increases in net worth during the years at issue. That is because the $ 75,000 would be added to his starting net worth for 1980 (and later years), but would be offset by a $ 75,000 increase in liabilities for 1980 (and later years). b. $ 50,000 in U.S. Treasury Securities and Purported Gift From Petitioner's Father
Petitioner testified that his father gave him $ 50,000 in keeping with a Greek tradition to pass family money to the oldest son and that his father got the money from some gold and $ 20,000 in cash. His brothers and sisters did not know about this gift. Petitioner testified that in 1979 he bought $ 50,000 in Treasury securities at a high interest rate at the Federal Reserve Board in New York *407 City. Petitioner said he went there with a Mr. Genute and his son Michael. Petitioner contends that he sold the Treasury securities for $ 50,000 after 1979 and used the proceeds for his mortgage business. Petitioner points out that Special Agent Tunkavige acknowledged in his February 22, 1984, memo that petitioner told him that he had bought Treasury securities when they were paying around 19 percent. We are not convinced that petitioner had $ 50,000 of U.S. Treasury securities on hand at the end of 1979. First, there is no documentary evidence that shows that petitioner bought these securities. Second, there is no evidence corroborating that petitioner's father gave him $ 50,000. Lusardi testified that in 1981 or 1982 petitioner said that his father had sold gold and given him the money. However, we are not convinced that petitioner's explanation to his accountant was true. Third, although petitioner testified at trial that he bought these securities in increments of $ 30,000 and $ 20,000 in 1979, there were no disbursements in these amounts from any of the checking accounts he used in 1979. Petitioner's 1979 and 1980 income tax returns show no interest income earned from *408 U.S. Treasury securities. Fourth, petitioner did not call Mr. Genute or his son Michael as witnesses, and he did not represent to the Court that they were unavailable to testify. The failure to call one or both of the Genutes to give testimony gives rise to the presumption that, if called, the witnesses would testify unfavorably. ; , affd. ; , affd. . Fifth, petitioner was under investigation by the Criminal Investigations Division from January 1984 to April 1986. He attended conferences in respondent's Examination and Appeals Divisions from April 1988 to October 1990, but never mentioned the $ 50,000 in Treasury securities allegedly on hand at the end of 1979. Petitioner argues that he did not mention the Treasury securities because he did not understand the tax impact of his claim that his father gave him money. *409 Petitioner also argues that he did not consider Treasury securities to be cash on hand. In the context of the other evidence (or lack thereof) on this issue, we are not convinced by these claims. c. Two Chevrolet Corvettes
Petitioner contends that in 1980 he sold a 1960 and a 1965 Corvette which he had restored years earlier and was keeping as an investment. Petitioner contends that the purchaser agreed to pay $ 35,000 for these cars, subject to petitioner's painting them. Petitioner contends that he used the $ 35,000 payment for the Corvettes in his mortgage business. We are not convinced that petitioner sold two Chevrolet Corvettes for $ 35,000 in 1980. There is no documentary evidence of when and to whom the Corvettes were purportedly sold. The only documentary evidence on this issue in the record is an invoice from petitioner's brother-in-law addressed to Nick's Auto Parts, dated October 14, 1980, stating that petitioner had a 1960 and a 1965 Corvette painted at a body shop in Cambridge, New York. Petitioner contends that he did not tell Special Agent Tunkavige about the two Corvettes because he thought Special Agent Tunkavige was asking only about his personal *410 cars, or cars he had registered and insured at the time. He claims that the invoice is the only evidence of the existence of the two cars because the DMV cannot provide records for vehicles after 8 years. We find petitioner's explanations to be unconvincing. Petitioner testified that the two Corvettes were part of his stock-in-trade. As stock-in-trade, respondent included them in the year end inventory of petitioner's auto parts business ($ 4,150 for 1979 and $ 1,300 for 1980). In the absence of evidence to the contrary, we find that respondent correctly accounted for the two Corvettes in the net worth analysis. d. Bulldozer
Petitioner contends that he bought a bulldozer in 1976 for $ 16,000 to clear his 20 acres, that he improved the bulldozer by adding tracks, and that Bill Benkendorf (Benkendorf) bought it in 1980 for $ 20,000. Petitioner contends that Benkendorf did not pay for the bulldozer on delivery; rather, petitioner retained a mortgage against property Benkendorf owned to secure a prior loan of $ 20,000 which Benkendorf paid in full just before he bought the bulldozer. We are not convinced that petitioner bought a bulldozer in 1976 and sold it for $ 20,000 *411 in 1980. First, there is no documentary evidence to support petitioner's claim that he bought the bulldozer in 1976 or sold it in 1980. Second, petitioner deducted depreciation on his 1979 and 1980 returns for various property, but not for a bulldozer. Third, during respondent's investigation, petitioner told Special Agent Tunkavige that he did not own a bulldozer during the years at issue. Fourth, petitioner relies on a memorandum from Benkendorf to show that he did not release Benkendorf's first mortgage because petitioner retained a mortgage on the bulldozer; however, the memorandum does not refer to a bulldozer. Finally, petitioner did not call Benkendorf as a witness or contend that he was unavailable. The failure of petitioner to call Benkendorf as a witness to give testimony, which, if true, would be favorable to petitioner, gives rise to the presumption that the witness, if called, would testify unfavorably. . e. Capital Gains Net Worth Analysis
Petitioner argues that the gain he claims to have from the sale of the 1960 and 1965 Corvettes is capital gain because they *412 were not part of his inventory. Petitioner also testified that the two Corvettes were part of his stock-in-trade. We need not decide this issue because we have found that petitioner did not sell the two Corvettes in 1980 for $ 35,000. Petitioner contends that he had about $ 100,000 in new parts that he held for investment and that the gain on the sale of these parts is capital gain. There is no documentary evidence that petitioner held $ 100,000 in new auto parts, and we are not convinced by his testimony. 3. Likely Sources of Income and Investigation of Leads Provided by Petitioner
a. Likely Sources of Income
Petitioner contends that respondent failed to adequately investigate leads provided by petitioner relating to his cash accumulations as of December 31, 1979. Petitioner points out that respondent did not introduce any evidence relating to any illegal activities by petitioner in Sarasota, Florida, or New Jersey. Petitioner contends he was never charged with any offense in Florida. Petitioner mistakenly believes that, to prevail, respondent must show that his likely source of income was illegal. The Commissioner may prove an underpayment by proving a likely *413 source of the unreported income, ; , or where the taxpayer alleges a nontaxable source, by disproving the specific nontaxable source so alleged, . Petitioner also argues that respondent introduced no evidence about any likely sources of income. We disagree. Petitioner's auto salvage and mortgage lending businesses were likely sources of income. b. Leads Doctrine
Petitioner argues that respondent failed to check with petitioner's former counsel, Bill Seed, regarding whether the sale of Treasury securities provided the funds for petitioner's mortgage lending business. The evidence does not support petitioner's claim that he told Special Agent Tunkavige that he used the Treasury securities proceeds to fund his mortgage lending business. Also, Special Agent Tunkavige contacted Seed in an attempt to investigate petitioner's mortgage business but was unable to trade specific items because petitioner's records were in disarray. The Commissioner must *414 investigate all leads presented by the taxpayer which are reasonably susceptible of being checked. . Petitioner did not offer any information which respondent failed to investigate. A taxpayer cannot complain about the insufficiency of an investigation where he has offered no leads or leads not reasonably susceptible of being checked. ; . We conclude that leads provided by petitioner were not reasonably susceptible of being checked any more than respondent did; thus respondent adequately investigated leads. c. Conclusion
Petitioner maintained no formal books and records, gave his accountant the figures to be reported from those businesses, admitted that he skimmed some income from his auto salvage business, and during the special agents' investigation, admitted that his net worth increases were due to his mortgage and auto salvage businesses. Respondent thoroughly documented all of the increases to net worth. Petitioner *415 has not supplied evidence that refutes the net worth analysis. Thus, we hold that respondent's reconstruction correctly determined petitioner's corrected taxable income as $ 131,671.51 for 1980, $ 157,463.03 for 1981, and $ 28,711.17 for 1982. 4. Whether Petitioner Is Collaterally Estopped To Deny Fraud for 1980
Respondent contends that petitioner is collaterally estopped to deny fraud for 1980 because he pleaded guilty to one count of tax evasion for 1980. Petitioner argues that he should not be collaterally estopped to deny fraud for 1980 because he pleaded guilty only because he faced enormous pressure from an indictment in Morris County (which was later dismissed), litigation with his wife, and problems with the town involving his auto parts yard, and because he had been assured that he would receive only 6 months' probation and $ 5,000 fine. A tax evasion conviction under section 7201, whether by trial or guilty plea, estops the taxpayer from denying that the return for that year is fraudulent under section 6653(b). , affd. . Collateral *416 estoppel applies if the issues presented are in substance the same as those previously decided, the controlling facts and legal principles have not changed, and there are no special circumstances warranting an exception to the normal rules of issue preclusion. ; . Trial courts have discretion to not apply collateral estoppel if special circumstances so warrant. However, the fact that a taxpayer faced numerous personal and legal problems when he pleaded guilty is not a sufficient special circumstance for us to not apply collateral estoppel. ; , affd. . We conclude that no special circumstances are present here to warrant a decision to not apply collateral estoppel and that petitioner is collaterally estopped to deny fraud for his 1980 tax year. 5. Additions to Tax for Fraud Under Section 6653(b)
a. Background
*417 Respondent determined that petitioner is liable for the additions to tax for fraud under section 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The existence of fraud is a question of fact to be decided by consideration of the entire record. ; , affd. without published opinion . First, the Commissioner must prove the existence of an underpayment. Respondent may not rely merely on the taxpayer's failure to carry the burden of proof for the underlying deficiency. ; . Second, the Commissioner must show that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or similarly prevent tax collection. . *418 b. Underpayment
The Commissioner may prove an underpayment by proving a likely source of the unreported income, ; ; ; or, where the taxpayer alleges a nontaxable source, by disproving the alleged nontaxable source, ; , affg. ; Petitioner's auto salvage and mortgage lending businesses are likely sources of his income for the years in issue. Also, several nontaxable sources alleged by petitioner have been disproved: $ 50,000 from petitioner's father, $ 75,000 from petitioner's sister, and $ 55,000 in proceeds from sales of a bulldozer and two Corvettes. Thus, respondent meets this requirement. c. Fraudulent Intent
Respondent must also prove by clear and convincing evidence that petitioner *419 had fraudulent intent. . For purposes of section 6653(b), fraud means "actual, intentional wrongdoing", , revg. ; or the intentional commission of an act or acts to evade a tax believed to be owing, , affg. . Fraud may be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. , affg. ; , affg. a Memorandum Opinion of this Court; , affd. . Courts have developed several objective indicators, or "badges", of fraud. . *420 Badges of fraud present in this case are petitioner's: (1) Failure to give complete information to his tax return preparer, , affg. per curiam ; (2) dealings in cash, ; (3) inadequate records, , affg. ; , affg. ; (4) implausible and inconsistent explanations of behavior; (5) concealment of assets; and (6) large understatements of income, . i. Incomplete Information to Tax Return Preparer
Petitioner gave Lusardi, his tax return preparer, only summary information. He concealed his 1980 mortgage lending activity from Lusardi by giving him only income figures from his auto salvage business. He was evasive when Lusardi asked him about *421 the source of funds for his mortgage lending business. ii. Dealing in Cash
Petitioner dealt primarily in cash. His dealings in currency gave him ample opportunity to skim unreported income from his businesses. We believe he took advantage of that opportunity. iii. Inadequate Records
Petitioner had no contemporaneous books or records. iv. Implausible or Inconsistent Explanations
We found petitioner's claims about loans from his sister, cash from his father, and the bulldozer and Corvette sales to be implausible. Petitioner changed his claims during the years respondent was investigating him about his cash on hand and his tax-free sources of cash. Petitioner had a ready supply of excuses for why he did not tell respondent about these things earlier. We also find petitioner's argument that he did not report interest income from his mortgages because he was a novice in the mortgage business, and he did not know if he was required to report it if he faced actual and threatened mortgage foreclosures due to defaults, to be unbelievable. v. Concealment of Assets
Petitioner concealed assets from respondent and his former wife. vi. Large Understatements of *422 Income
Petitioner admitted skimming money from his auto salvage business. Petitioner failed to report a significant amount of income from his auto salvage and mortgage lending businesses. d. Conclusion
Petitioner points out and respondent concedes that he cooperated throughout respondent's investigation. Petitioner cites: (taxpayer regularly failed to report income, had a predilection for undocumented cash transactions, and had a pattern of registering assets in the name of an intimate friend; taxpayer liable for attempted evasion of income tax); , affg. (the burden is on the Government to prove fraud; fraud is never presumed); (the mere understatement of income alone is not enough to establish fraud); (taxpayer not liable for fraud addition; taxpayer cooperated with police and did not make misleading statements *423 to the Internal Revenue Service or conceal assets); and (taxpayers' poor recordkeeping was due to their limited education and lack of business sophistication; taxpayers' practice of dealing in cash was consistent with unusual nature of their scrap metal business; taxpayers were credible witnesses and not liable for fraud addition). The fact that petitioner cooperated during the investigation favors petitioner, but does not outweigh the many badges of fraud we have found above. Thus, we hold that petitioner is liable for the additions to tax for fraud for 1980, 1981, and 1982. 6. Special Agent's Investigation of Petitioner
Petitioner asks that respondent's net worth method be disregarded or that petitioner be given the benefit of the doubt in this case because, petitioner contends, Special Agents Tunkavige and Thomas Egan, and perhaps others, conducted themselves improperly during the investigation of the case. We disagree. There is no credible evidenced in the record that any Government employees conducted themselves improperly during the investigation of this case. Thus, we reject petitioner's *424 contentions that: (1) Respondent's original information about this case came from Lt. Bernard Kelly, who was (or had been) in charge of the Organized Crime Unit for Northern New Jersey, and who petitioner also says was advising him on how to proceed at every step of the investigation; (2) Special Agent Tunkavige urged petitioner to rely on Lt. Kelly; and (3) Lt. Kelly worked closely with the Internal Revenue Service. Petitioner did not call Lt. Kelly or Special Agent Egan to testify, and did not show that they were unavailable. Petitioner's failure to call these witnesses leads to the presumption that, if called, the witnesses would testify unfavorably to him. ; . . For the foregoing reasons, Decision will be entered under Rule 155. Footnotes
1. Sec. 6653(b)(1) for 1982.↩
2. Fifty percent of the interest due on $ 5,832.↩
1. Petitioner conceded that respondent's net worth analysis is correct except for four disputed items and a capital gains issue. Thus, we need not make findings of fact about petitioner's net worth except as they pertain to disputed items.↩